J. H. ELLINGTON v. R. H. RICKS.

(Filed 24 March, 1920.)

**1. Negligence—Invites—Premises—Owner—Reasonably Safe Condition.**

One who invites another on his premises owes him the duty of keeping such of them as is covered by the invitation, including that close thereto, and upon which the invitee may be expected to casually go, in a reasonably safe condition, so that he may not be subject to injury.

**2. Same—Explosives—Evidence—Questions for Jury—Nonsuit—Trials.**

The owner of the premises had contracted for the replacement of his old gasoline generator with a new one, which the seller was to install in a small brick house, where the old one had been used. There was evidence tending to show that the superintendent of the owner assumed to drain the old generator of gasoline and to move it from the brick house, and after he had placed it a short distance therefrom the owner called attention of the employee of the seller, doing the installation, to the old generator, and while he was examining it some gasoline left therein exploded to the injury of the seller's employee, for which he brings his action against the owner to recover damages. *Held*, it was for the determination of the jury as to whether the owner observed the care required of him to keep his premises in a reasonably safe condition, and a motion for judgment as of nonsuit was properly overruled.

APPEAL by defendant from *Guion, J.,* at the October Term, 1919, of WAKE.

This is an action to recover damages for personal injury inflicted while the plaintiff was engaged in the installation of an acetylene gas generator on the premises of the defendant.

The defendant lived about five miles from Rocky Mount in Nash County. He had in use an acetylene gas generator, which furnished light for his home. It had been used about thirteen years and was located in a small brick house about 25 feet from the residence; the brick house was not used for any other purpose; it had one door but no windows; the gas generator was placed in front of the door, a few feet inside the house, J. B. Colt & Co., sold to defendant a new generator and was to have it installed, the defendant agreeing to pay the cost at a stipulated price per hour. There was in the State several men who made it a business of installing these generators, one of whom was the plaintiff, and the State Manager sent the installing contract of the machine sold Mr. Ricks to the plaintiff. The plaintiff and his helper, Mr. Maynard, proceeded, after the generator had been received at Mr. Ricks', to the defendant's to install the generator. They reached there about 11 o'clock of the day. Mr. Bozeman, the farm superintendent and general manager of Mr. Ricks, met them, and they went to the gas house. The new generator had to be uncrated; the old machine to be disconnected and removed from the gas house.

The plaintiff testified in his own behalf as follows:

"An acetylene gas generator furnishes gas for lights for homes, stores or for cooking or ironing. The gas is made by water coming in contact with carbide in the machine and is conducted from the machine by pressure of one and a half pounds to the square inch. The gas drops in the carbide and that comes under a bell, and as it goes out it lowers and feeds more carbide. It works automatically by a bell."

That he was doing work for Mr. Williams at Red Oak and this paper came to him. He went to Mr. Ricks' place, five miles from Rocky Mount. One of Mr. Ricks' hands met him at Dortch's store and carried him over in a buggy to Mr. Ricks' home. When he got there Mr. Bozeman was not at home, but his wife sent for him and he came up and said that they were ready for the installation to be made, and they went in and looked at the old machine that was then in use; that he told Mr. Bozeman that that make of machine was new to him; that he did not know anything about it, and did not know where the carbide was in the chambers and asked Mr. Bozeman to remove the carbide from the old machine and he said he would do it; that witness went and uncrated the new machine, which was fifty yards from the out-house where the old machine was and when he got through that work of uncrating, Mr. Bozeman said he had the carbide removed from the old machine and witness asked Mr. Maynard, his helper, to disconnect the machine for him.

The old machine was in a little brick house almost opposite from where the witness was working. The brick house was used only for these gas generator machines. It was about 20 or 25 feet from the main residence. He went to work about 12 o'clock and it took him 15 or 20 minutes to uncrate his machine. Mr. Bozeman said he had the carbide removed and they had to tilt the machine to get it out of the house. Mr. Bozeman had some colored men to help him get it out and directed the work of removing the old machine. The only thing witness did was to put his hands on the old machine when it was tilted over to be moved out of the house. The machine was 7 or 7½ feet tall. Mr. Bozeman had the direction and control in the removal of the old machine. It took 15 or 20 minutes to remove the old machine out of the house after witness got back from uncrating his machine and they set it 12 or 15 feet from the door. Witness and his helper had to build a brick foundation right up there in the same house to put the new machine on; but after they got the foundation built they set up their machine and while it was being filled with water Mr. Maynard called him and said who is this machine made by and the witness said he saw some inscription on the side and that he walked up to the side of the old machine next to Mr. Maynard and saw the nameplate on it and he said it was made by some Chattanooga firm, and he said he saw some printing matter on one side, and he walked around to the opposite side of the machine, and Maynard walked toward the door and just as he got near the door and when witness got on the other side and saw the printed (matter) and stooped over to get his face up even with it, the old machine exploded and threw him 12 or 15 feet from the machine. It was sitting a little to the left of the house from which it was taken, and

from 12 to 15 feet from the door. It was something like two and one-half feet in diameter, and from the base to the top was something like seven feet, I believe, and was made out of galvanized iron. Mr. Bozeman gave him no warning about the old machine. He did not know there was any danger from the old machine as he stood by it. The machine was in a dilapidated condition, and after Bozeman told witness that he had removed the carbide that he, witness, could not understand there would be any danger from what he understood about the carbide system, and that he knew that some of the water had been poured out and practically all of it. But on the way to Rocky Mount after the explosion, Mr. Bozeman told me and Maynard that he had not removed all the carbide.

"It required 10 or 15 minutes for the water to run into the new tank installed by him. During that time he had nothing else to do and Mr. Maynard called him and asked by whom the old tank was made and he walked out to where Maynard was; that he had charge of the contract and Mr. Maynard was his helper; that he brushed off the name plate with his cap; that if the man who removed the carbide from the tank had taken all that there was in the main receptacle, there was no place where the carbide could have stuck in the wall to have. caused the explosion if it had been shaken up. The cause of the explosion was because the carbide was in the water."

At the conclusion of the evidence there was a motion for judment of nonsuit, which was denied, and the defendant excepted.

There was a verdict and judgment for the plaintiff and the defendant appealed.

*R. N. Simms for plaintiff.*
*Battle & Winslow and Manning, Kitchin & Mebane for defendant.*

PER CURIAM. There are several exceptions in the record, but all of them are covered by the exception to the refusal to nonsuit, and on this it is conceded, and properly so, that the plaintiff was an invitee on the premises of the defendant, and as such entitled to hold the defendant to the duty of keeping the premises covered by the invitation in a reasonably safe condition in order that he might not be subjected to injury.

It is also not contended by the defendant that there is no evidence that the part of the premises, where the plaintiff was when he was injured, was unsafe, but the position insisted upon in the able and learned brief of the defendant and on oral argument is that the plaintiff when injured was on a part of the premises where he was not expected to go.

44—179

In other words, we are asked to hold as a matter of law that the plaintiff by stepping outside of the little room in which the new tank was being installed, which was 6 by 12 or 14 feet, while waiting for the tank to fill with water and walking 12 or 15 feet to look at the old tank, from which Bozeman, the superintendent and manager of the defendant, had told him the carbide, the cause of the explosion, had been removed, departed from the terms of his invitation and must be treated as a trespasser or licensee at the time of his injury, and as such the defendant owed him no duty except to refrain from wilful injury.

"The authorities are entirely agreed upon the proposition that an owner or occupant of lands or buildings who directly or by implication invites or induces others to go thereon or therein owes to such persons a duty to have his premises in a reasonably safe condition and to give warning of latent or concealed perils." 20 R. C. L., 55, and that "The owner or occupant of premises is liable for injuries sustained by persons who have entered lawfully thereon only when the injury results from the use and occupation of that part of the premises which has been designed, adapted, and prepared for the accommodation of such persons." 20 R. C. L., 67.

If an invitee goes "to out-of-way places on the premises, wholly disconnected from and in no way pertaining to the business in hand" and is injured, there is no liability. *Glaser v. Rothschild,* 221 Mo., 180, but a slight departure by him "in the ordinary aberrations or casualties of travel" do not change the rule or ground of liability, and the protection of the law is extended to him "while lawfully upon that portion of the premises reasonably embraced within the object of his visit." *Monroe v. R. R.,* 151 N. C., 376; *Pauckner v. Waken,* 14 L. R. A. (N. S.), 1122.

As said by *Winslow, C. J.,* in *Charron v. Fuel Company,* 149 Wis., 240 speaking of a similar question as applied to an employee. "The law aims to be reasonable. It recognizes that it has to deal with imperfect human beings and not with faultless and unerring automatons, and that its rules should be shaped accordingly. It must recognize the fact that men employed in hard physical labor require and habitually take some brief respite at times during the work as opportunity offers; and it must also recognize the fact that such a respite, if only of the ordinary and usual nature, cannot rightly be called a leaving of the employment. In the present case the plaintiff had just carried a plank, doubtless of considerable weight, to the top of the structure. In returning he stopped for a minute or two at a convenient stopping place stepped perhaps eight feet from his line of travel, and gazed at the operations upon and about the vessel and the harbor below, which were doubtless interesting and attractive. We do not feel that we are obliged to hold or ought to hold as matter of law that this brief and very natural break in the plaintiff's routine labor divested him of his character as an employee."

The tank which caused the injury was close to the course of travel from the little house where the new tank was being installed to the dwelling; it was within 12 or 15 feet of the little house and it was on that part of the premises being used in·the installation of the new tank, because it was necessary to place it there in the proper performance of the duty, and this was done under the direction of the manager and superintendent of the defendant.

The plaintiff and Bozeman were in fact using in their work the part of the premises where the plaintiff was standing at the time of his injury. .

We do not think under these conditions it can be said as a legal conclusion that there was such a departure by the plaintiff from the scope of his invitation as to bar a recovery.

No error.